1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICO COPELAND,
Plaintiff,

v.

GRAYBAR ELECTRIC COMPANY, INC.,
Defendant

NO. 2:22-cv-280

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This matter comes before the Court on a Motion for Summary Judgment, filed by Defendant Graybar Electric Company, Inc. ("Graybar"). Graybar seeks judgment in its favor on Plaintiff Rico Copeland's state and federal claims of hostile work environment, race discrimination, and retaliation. Having reviewed the briefs filed in support of and opposition to the motion and the remainder of the record, and having held oral argument thereon, the Court finds and rules as follows.

## II.    BACKGROUND

Plaintiff Rico Copeland was employed at Graybar Electric from July 2019 until his employment was terminated in October 2021. (Copeland Dep. 11:7-10). Graybar is a national distributor and wholesaler of electrical and telecommunications products, headquartered in Missouri. Plaintiff was employed in Graybar's Renton, Washington facility as a material handler

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

- 1

in the wire department, cutting bulk reels of different gauges of wire to customer specifications.

Plaintiff, who is Black, claims he was subjected to a hostile work environment, experienced disparate treatment on account of his race, and was terminated in retaliation for reporting incidents of what he claims were race-based harassment to management. He offers the following allegations, which the Court assumes as true for purposes of this motion, in support of those claims.

**A. Incidents That Plaintiff Claims Contributed to Hostile Work Environment**

Plaintiff's complaint focuses primarily on the alleged conduct of a fellow material handler in Graybar's wire department, Fred Christian. Copeland claims that on his first day of work, July 1, 2019, Christian "snapped his fingers at [Copeland], whistled, and said 'come here,' as if he was calling a dog." Copeland Decl., ¶ 5. Several days later, Christian allegedly did it again; this time, Copeland asked him not to do it anymore. Christian "glared at [Copeland] for about five seconds, crammed his hands into his pockets, and stormed off." *Id*. Around this time, Copeland alleges he repeatedly caught Christian staring at him; "this wasn't regular staring, it was mean-mugging: staring with squinted eyes and a contorted mouth." *Id*., ¶ 6.

Sometime in early 2020, six or more months later, "Christian pulled up his sleeve and showed [Copeland] his forearm," revealing visible cuts on his arm. According to Plaintiff, Christian stared at him "dead in the eyes and said, 'I cut myself so I don't shoot people like you' in an angry and aggressive tone." Copeland Decl. ¶ 12.

In late 2020, Christian asked Copeland for help with a project while Copeland was in the middle of another task. When Copeland declined to interrupt what he was doing to help, Plaintiff claims, Christian "became very angry. There was a box of fiber nearby; he swelled up and

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

- 2

1    punched it really hard. Then he turned and stared me down, flexing and posturing and making eye

2    contact, as he slowly walked away, as if to instigate something." Copeland Decl., ¶ 17. Copeland

3    interpreted this behavior as a threat, or an invitation to fight.

4         In August 2021, Copeland overheard Christian telling another coworker, Moki Midar, that

5    "some dumbass keeps putting green tape on everything." Copeland Decl., ¶ 26. Since Copeland

6    was the handler who was using green tape, he understood Christian to be talking about him,

7    although Midar has denied that Copeland was referenced directly. Midar Dep. 9:9-22.

8         Approximately 5 days later, on August 10, 2021, Christian was driving a forklift through

9    the warehouse and took a corner too fast, and "flipped a bundle of wire off a forklift towards

10   [Copeland], hitting [his] shoulder and almost crushing [him]." Copeland Decl., ¶ 28. Copeland

11   claims he was barely able to dodge the full force of the reel of wire, which "weighed probably

12   several hundred pounds" and grazed him in the shoulder. Christian did not stop to check whether

13   Copeland had been hurt, or to apologize, and Copeland believes Christian flipped the wire at him

14   on purpose.

15        Plaintiff makes several other, less-specific allegations, lacking many details such as dates

16   and circumstances. *See, e.g.*, Copeland Decl., ¶ 7 ("If there was an error in work, Fred Christian

17   immediately blamed a Black employee."); *id.*, ¶ 10 ("Christian tried to control how work was

18   distributed to me, mean-mugged me as described, talked to me in a confrontational or negative

19   tone, and would disrespectfully interrupt my work."). In addition, Plaintiff claims that Christian

20   "constantly talked about firearms" at work. Copeland Decl. ¶ 14. "He was often menacing when

21   he spoke about them, not just lightly discussing them as a hobby but expressing it like an

22   intimidation factor that he had access to firearms and knew how to use them." *Id*.

23

24   ORDER GRANTING DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT

25    - 3

1    Copeland also had several interactions with other employees in the wire department that

2    he claims contributed to the hostile environment at work. "Sometime in 2020," Plaintiff heard

3    Ken Christian (Fred Christian's brother) say, in reference to news of a police shooting of a Black

4    man six times in the back, "Yea, a couple of times would have been okay." Copeland Decl., ¶ 15.

5    In April 2021, Tyler Aves, Copeland's lead material handler in the wire department, asked

6    Copeland to "take more jobs." Copeland asked Aves to give the jobs to other workers, as he had

7    several jobs ahead of Aves, and Aves "responded by raising his voice, making whooping noises

8    and telling me to do my job." Copeland Decl., ¶ 21. The confrontation escalated, and Copeland

9    acknowledges both men lost their temper, "with him yelling at me and me yelling at him in equal

10   measure." *Id*. Copeland was sent home and was given a "second written warning," the last step

11   before termination according to Graybar policy. He claims Aves was never disciplined, and

12   continued to taunt him for several days after the incident. *Id*., ¶ 23 ("Aves walked around with his

13   chest puffed out, acting arrogant; and over the next several days, Aves continued to make the

14   "woo woo" sounds he had made before and smirk at me whenever I walked past.").

15   **B. Copeland's Reports to Management and Management's Response**

16   Copeland reported these alleged incidents to various members of Graybar's management.

17   He reported to his supervisor, Cameron Wilson, the early 2020 incident in which Christian rolled

18   up his sleeve and allegedly said to Copeland, "I cut myself so I don't shoot people like you."

19   (Wilson Dep. 113:22-114:22.) Wilson's supervisor, Service Center Manager Angela Levack-Neil,

20   spoke with Christian about the incident. Christian denied his comments were directed to

21   Copeland, but out of concern for his mental health, Levack-Neil referred Christian to Graybar's

22   employee assistance program. Christian Dep. 66:17-25; Levack-Neil Dep. 17:13-18:6. Copeland

23

24   ORDER GRANTING DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT

25   - 4

also reported to Wilson the late 2020 alleged incident in which Christian angrily punched a box of fiber. Wilson gave Christian a verbal reprimand. Christian Dep., 44:20-22.

Copeland reported the August 2021 forklift incident to Levack-Neil. Levack Neil was unable to verify exactly how the incident occurred, as security cameras in the warehouse were not angled towards where it had happened. The explanation Christian gave her was that "the cradle, which is the pallet the reel was on, was partially broken and he didn't realize it. And when he turned right, it rolled off the left side of the pallet. . . . [and] Rico stopped the reel from rolling." Levack-Neil Dep., 4:7-13. Levack-Neil considered the explanation credible, and concluded the incident had been an accident. She also did not think that it was serious, as she did not believe the reel would have been moving quickly by the time it reached Copeland. *Id*., 65:13-20.

Twice in August 2021, Copeland complained to Wilson about a single conversation Christian was having about guns, and also reported his concerns about the conversation to Levack-Neil and then Senior Human Resources Advisor Melanie Hull. Speaking with Christian, Wilson learned that Christian had been discussing target practice with another coworker. Wilson Dep. 22:20-25:8. Levack-Neil and Wilson asked Christian not to talk about guns or firearms in the workplace, and apparently after that he did not. Christian Dep., 68:16-18. In August 2021, Copeland also reported to Wilson that he believed Christian had indirectly called him a "dumbass" for using the green tape. Wilson spoke with both Christian and Midar, to whom Christian had been speaking, and confirmed the comment had not been directed specifically at Copeland. The next day, Wilson gathered wire department employees and cautioned them he would not tolerate name-calling. Wilson Dep., 75:7-14.

At a meeting with Wilson and Levack-Neil on August 13, 2021, Copeland reported his

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

belief that Fred Christian was "racist." The allegation spurred an investigation by Levack-Neil and Hull, who interviewed several other minority employees, whom Copeland had identified as people who could corroborate his claim. After speaking with these employees, who generally did not believe Christian was treating employees of color differently from white employees, Levack-Neil and Hull concluded that Copeland's claim could not be substantiated. *See* Levack-Neil Dep., 46:3-17; 47:7-10 ("Based on their statements that -- they told me the opposite of what Rico had told me. Rico had told me that he was experiencing racism from Fred and that these other two employees would tell me the same thing, and they did not. . . . I did not have witnesses who stated what he said he thought they were going to. I struggled to see where I thought an issue of racism was happening.").

In an attempt to keep Copeland and Christian separate, sometime in early 2021, management granted Copeland's request that he be allowed to work earlier in his shift, which allowed him to avoid spending time alone with Christian. Copeland Dep., 84:24-88:20. This accommodation allowed Copeland to work with Christian only when other employees were also present, and was, in Copeland's words, Wilson's attempt "to try to keep the peace." *Id*., 88:18-19.

By August 2021, Copeland felt his concerns were not being addressed despite having reported multiple incidents to Wilson and Levack-Neil, so he brought his complaints up the management chain. In the beginning of August 2021, he reported many of the incidents outlined above directly to HR advisor Melanie Hull. Copeland Decl., ¶ 27. He spoke with another manager, Brandon Bergstrom, in late August 2021, stating that he believed Christian's behavior was racially motivated. *Id*., ¶ 34. He continued to believe management was not taking his concerns seriously, and says it came to a point with Christian that he was afraid for his safety. *Id*.,

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

¶¶ 40-44. Ultimately, on October 5, 2021, "after more than a year of talking to HR and [his] immediate managers about Christian," Copeland asked to meet with Seattle District Director Steven Horst. The day after Copeland spoke with Horst, Graybar moved Christian out of the wire department where he and Copeland worked. *Id*., ¶ 46.

### C.  Copeland's Termination in October 2021

Copeland was terminated a little over a week later, on October 14, 2021. As referenced above, approximately six months earlier, Copeland had received his second written warning, the final step before termination, for having "threatened -- talked to the lead above him [Tyler Aves] in a threatening manner" and having "used harsh and profane words toward his lead in a loud manner." Hull Dep., 26:23-24; 27:7-8. Then, several events occurred in the weeks leading up to the date of his termination. First, Levack-Neil learned that Copeland had told a young female coworker, Ty Hampton, that he "wouldn't want [his] daughter her age working in wire because of the danger. . . . [He] told her it could be a dangerous position, and that she could go to management and tell them it was not a fit for her." Copeland Decl. ¶ 50. Hampton was offended by this comment, interpreting it to mean Copeland did not believe women should be working in the wire department. Hampton Dep., 13:9-22. Notes dated October 13, 2021 reflect that Levack-Neil also learned that in a conversation with Nate Oei, Copeland had referred to Hampton as a "bitch" in a vulgar context, a comment that Copeland has not denied making.

Second, one week before Copeland's termination, it was brought to management's attention that several employees "overheard Mr. Copeland using the "n" word in conversations" in the workplace. Aves Decl., ¶ 4. Wilson and Levack-Neil spoke with Copeland about it, and Copeland admitted the accusation was true, claiming he'd done so in the parking lot and "among

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

friends." Copeland Decl. ¶ 47. However, apparently believing the issue was being manufactured

in retaliation for his comment to Hampton and/or as grounds for his termination, Copeland

attempted to find out who had told on him. He confronted coworkers Moki Midar and Nate Oei to

find out if they are the ones who had told on him, and accused them of being part of a conspiracy.

Copeland's approach to these two was apparently aggressive and loud, confronting Oei in the

break room for some ten minutes. In deposition, Oei testified:

> Q. Did you feel physically threatened?
> A. Yes, I did.
> Q. And why did you feel physically threatened?
> A. Because he was in my face pretty much yelling at me. …
> Q. Well, at the time, did you feel like you had to back away, or do you recall
> feeling unsafe in that situation with him?
> A. Yes, I had to back away.

Oei Dep., 14:12-23. Copeland does not deny these confrontations occurred or deny that

Midar and Oei would have been upset and felt threatened by them. In his declaration, he states "I

had no idea that they considered these talks to be confrontations, but after hearing their deposition

testimony about these incidents, I realize I had come across as more hostile than I intended. . . .

But I was very angry about the situation and felt that I was being set up to be fired."  Copeland

Decl., ¶ 49. On October 14, 2021, Wilson advised Copeland over the phone that his employment

had been terminated. (Copeland Dep. 216:1-7; Levack-Neil Dep. 103:2-17). Hull has testified that

Copeland was terminated in part based upon these confrontations, and because he "continued to

disrupt the . . . workforce." Hull Dep., 20:14-15; 22. Similarly, Levack-Neil testified that

Copeland's "termination was made based on a continued disruption to our workplace and the

difficult work environment that that caused." Levack-Neil Dep., 15:3-6.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1

2

## III.    DISCUSSION

3

### A.  Standard for Summary Judgment

4

5     Summary judgment is appropriate if the evidence, when viewed in the light most

6     favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any

7     material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*

8     *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th

9     Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of

10    material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the

11    moving party meets its burden, then the non-moving party "must make a showing sufficient to

12    establish a genuine dispute of material fact regarding the existence of the essential elements of his

13    case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658.

14    The court is "required to view the facts and draw reasonable inferences in the light most favorable

15    to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

16          Title VII of the Civil Rights Act of 194 and the Washington Law Against Discrimination

17    make it unlawful for an employer to discriminate on the basis of several protected classes,

18    including race. 42 U.S.C. § 2000e–2(a)(1); RCW § 49.60.180. "Washington courts often look to

19    federal case law on Title VII when interpreting the WLAD"). *Blackburn v. State*, 375 P.3d 1076,

20    1080 (Wash. 2016).

21    ### B.  Hostile Work Environment Claims

22          *1.  Elements of Hostile Work Environment Claim*

23          To succeed on a Title VII claim for hostile work environment, a plaintiff must show that:

24    (1) he was subjected to a hostile work environment; and (2) the employer was liable for the

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

25

harassment that caused the hostile environment to exist. <u>Fried v. Wynn Las Vegas, LLC</u>, 18 F.4th

643, 647 (9th Cir. 2021).

Establishing a prima facie case for a hostile work environment requires a plaintiff to

demonstrate: (1) he was subjected to verbal or physical conduct because of his membership in a

protected class; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or

pervasive to alter the conditions of the plaintiff's employment and create an abusive work

environment. *Vasquez v. Cnty. of Los Angeles,* 349 F.3d 634, 642 (9th Cir. 2003); *see also* RCW

Chapter 49.60; *Loeffelholz v. Univ. of Wash.,* 175 Wn.2d 264, 265 (2012). Title VII, however, "is

not a general civility code," *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir.

2010), and in the Ninth Circuit, there is "a high burden to finding a hostile work environment,"

*Dawud v. Boeing Co.*, No. C17-1254-JCC, 2018 WL 4735703, at *6 (W.D. Wash. Oct. 2, 2018)

(citing *Manatt*, 339 F.3d at 798-99). "In general, the Ninth Circuit has found that ... 'isolated'

incidents, occurring sporadically over a long period of time, are not severe or pervasive enough to

alter the conditions of employment." *Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067,

1085 (N.D. Cal. 2014), *aff'd*, 644 F. App'x 787 (9th Cir. 2016) (citing and quoting *Manatt*, 339

F.3d at 795-99).

An employer will be liable for creating a hostile work environment if it fails to take

immediate and corrective action in response to a coworker's or third party's sexual harassment or

racial discrimination the employer knew or should have known about. *Fried v. Wynn Las Vegas,

LLC,* 18 F.4th 643, 647 (9th Cir. 2021).

   2. *Whether Conduct Was Pervasive and Severe Enough to "Alter Conditions of
      Employment" and Because of Plaintiff's Membership in Protected Class*

Graybar first argues that the events that Copeland complains of were neither pervasive nor

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

- 10

1 severe enough to meet the "hostile work environment" standard set by the Ninth Circuit. "To

2 determine whether an environment is sufficiently hostile or abusive enough to violate Tile VII, we

3 consider 'all the circumstances, including the frequency of the discriminatory conduct; its

4 severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

5 whether it unreasonably interferes with an employee's work performance.'" *Christian v. Umpqua*

6 *Bank*, 984 F.3d 801, 809 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Davis v.*

7 *Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008)). "[S]imple teasing, offhand comments, and

8 isolated incidents (unless extremely serious)" are not sufficient to create an actionable claim

9 under Title VII, but the harassment need not be so severe as to cause diagnosed psychological

10 injury. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and

11 citation omitted); *see also Harris*, 510 U.S. at 22. It is enough "if such hostile conduct pollutes the

12 victim's workplace, making it more difficult for her to do her job, to take pride in her work, and

13 to desire to stay in her position." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir.

14 2017).

15     The conduct outlined above does not meet this threshold. Disregarding the generalized and

16 conclusory claims of disrespectful treatment, as the Court must,[1] Plaintiff claims he was subjected

17 to only a few discrete, "isolated incidents," occurring many months apart during a span of over

18 two years, which were neither "extremely serious," nor frequent and pervasive, and are thus not

19 sufficient to constitute a hostile work environment. *Faragher*, 524 U.S. at 788. These events

20 include Christian's whistling at Copeland to get his attention, in July 2019; Christian's comment

21

22 _____

[1] *See Caldwell v. Boeing Co.*, 2019 WL 1556246, at *14 (W.D. Wash. Apr. 10, 2019) (disregarding generalized allegation that supervisor "often would say derogatory things about African Americans," because "[c]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence, are insufficient to create a genuine issue of material fact) (quoting *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012)).

23

24 ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

25   - 11

about cutting himself in early 2020, over six months later; Christian slamming his fist down on a box in late 2020 another half-year (or more) later; a comment in August 2021 indirectly referring to a "dumbass" using green tape; and perhaps several conversations about guns that Copeland alleges were subjectively intimidating, but which contained no objectively threatening content and were not even apparently directed at him. Finally, the incident involving the forklift and the reel of wire that Christian allegedly flung at Copeland is not accompanied by any verifiable allegations—apart from Copeland's suspicion—that would support a finding that the event was anything other than accidental and at worst, reckless. On summary judgment, this is insufficient. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive. To be cognizable on summary judgment, evidence must be competent."). Here, there are simply no objective facts alleged that would support a jury finding that this event—unsafe though it may have been—was intentional. Copeland's subjective feelings, which the Court does not doubt, are, without such objective support, insufficient to demonstrate the existence of a hostile work environment. *See Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1017 (9th Cir. 2018) (citing *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) ("The work environment must be both subjectively and objectively perceived as abusive.").

Furthermore—and critically—even as alleged by the Plaintiff, these incidents were not accompanied by any objective evidence of racial animus. Clearly, Christian and Copeland did not get along; but there is nothing in the record tying Christian's behavior towards Copeland to an

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1    impermissible race-based motive. In the Ninth Circuit, courts have repeatedly held that the

2    allegedly harassing conduct must be directly tied to some evidence of racial animus, and evidence

3    (such as may exist here) that Christian used an offensive racial epithet outside of Copeland's

4    presence is insufficient to give rise to actionable hostility.[2] *See, e.g., Henry v. Regents of the Univ.*

5    *of California*, 37 F. Supp. 3d 1067, 1072 (N.D. Cal. 2014), *aff'd*, 644 F. App'x 787 (9th Cir.

6    2016) (dismissing hostile work environment claim on summary judgment where "there are no

7    facts, other than plaintiff's speculation, that any of these [allegedly harassing] incidents

8    were motivated by racial animus on the part of [plaintiff's supervisor]. The one race-related

9    comment attributable to [plaintiff's supervisor, that he was "not going to let a black man manage

10   anybody,"] along with his responsibility for leaving a noose in the workplace do not serve to

11   render every interaction between him and plaintiff evidence of race-based harassment").

12          The one comment made directly to Copeland that even arguably implicates a race-based

13   motivation—Christian's statement that he cuts himself so he doesn't "shoot people like you"—

14   simply cannot bear the weight Plaintiff would have it carry, not only because the race connection

15   is at best ambiguous, but also because the comment is the only even arguably race-related

16   comment Christian is alleged to have said to Copeland. The courts in this circuit have required

17   substantially more. *See, e.g., Manatt v. Bank of America, NA,* 339 F.3d 792, 795–99 (9th Cir.

18

19   _____

     [2] In his declaration, Erik Cota stated that he "heard Fred Christian refer to Rico Copeland as the N word." E. Cota

20   Decl., ¶ 4. However, his later concession that he wasn't "paying close attention" before signing his declaration calls
     into question the reliability of this testimony. *See* E. Cota Dep., 29:1-5. The testimony is further undermined by its

21   lack of any details, such as even an approximate date, or to whom Christian was speaking. The Court is also
     concerned about the grave allegation that the declaration may have been signed under false pretenses. More
     specifically, it appears that although the Erik Cota declarations filed on January 20, 2023 and April 21, 2023 contain

22   slightly but significantly differing testimony, the signature pages of the two declarations are quite obviously exactly
     the same. *See* Def.'s Rep. at 21. Plaintiff's counsel failed at oral argument to supply an adequate explanation for

23   how this came to be. Nevertheless, even crediting Erik Cota's declaration, the Court's conclusion that Copeland was
     not subjected to an actionable degree of race-based hostility would stand, as there is no evidence that Copeland
     himself was aware of this comment, or that Cota ever reported it to Graybar management. *See* Cota Dep., 42:20-23.

24   ORDER GRANTING DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT

25

2003) (co-workers' use of the term "China-man," ridicule of the plaintiff's mispronunciation of English words, statement that "I've had the worst kind of trouble with your countrymen," using gestures mocking the appearance of Asians—held to be insufficient to create a hostile work environment); *Vasquez v. County of Los Angeles,* 349 F.3d at 642–44 (comments by supervisor of plaintiff deputy probation officer that he had "a typical Hispanic macho attitude" and was a "juvenile delinquent," and that he should work in the field because "Hispanics do good in the field," plus negative remarks and complaints made about the plaintiff and yelling at him—held insufficient to create a hostile work environment); *Kortan v. California Youth Authority,* 217 F.3d 1104, 1110–11 (9th Cir.2000) (comments by supervisor calling female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence, and calling the plaintiff "Medea"—held insufficient to create a hostile work environment). Simply put, none of the other interactions with Christian of which Copeland complains gives rise to an inference of racial animus, and the one comment that even arguably does is insufficiently severe to stand on its own. Accordingly, the Court grants Defendant's motion on Plaintiff's hostile work environment claim.

        3.   *Whether Graybar Can Be Held Liable Because It Failed to Take Adequate Remedial Measures*

Additionally and in the alternative, the Court also concludes that Graybar cannot not be held liable, regardless of whether the incidents described above meet the threshold for hostile work environment, because it took timely and adequate measures in response to each complaint Copeland made, including and especially the ultimate decision it made to move Christian out of the wire department and away from Copeland altogether. As outlined above, it is undisputed that throughout Copeland's tenure, managers at Graybar followed up on every complaint Copeland

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

made. As to most of these incidents, after speaking with other employees who witnessed events,

management determined that the behavior Copeland complained of could not be substantiated,

was mutual or minor, or was accidental in nature. Even so, managers took steps to respond to

complaints by separating Copeland and Christian, by rearranging work stations, or by making

sure a manager or other employee was present in the wire department when the two had to work

together. As Copeland testified:

> A. Cameron [Wilson] clocked in around the [same time] as I. So he was back
> there to keep Fred and I separated. And if Fred was back there and, like, Cameron
> didn't come in that day, I would ask someone else from management who wasn't
> doing anything, could you please come back here until the lead comes in so I
> don't be left alone with him because I don't know what he's -- you know, I don't
> know -- I don't know what's going on. I don't want to have my back turned to
> him and I can't trust him.
>
> Q. And did management accommodate that?
>
> A. Yes. Yes, they did.
>
> Copeland Dep., 92:19-93:5. On several occasions, managers verbally reprimanded

Christian or other employees for the offending behavior. None of the subjectively upsetting, but

objectively mild incidents Copeland has described would have called for more. *See Campbell v.*

*Hawaii Dep't of Educ.*, 892 F.3d 1005, 1018 (9th Cir. 2018) (dismissing hostile work

environment claims where employer "promptly investigated all incidents" and "took corrective

action where [employee's] complaints were substantiated," because "our law does not require an

employer to be immediately and perfectly effective in preventing all future harassment by a third

party. Again, the question is one of negligence: Did the employer take steps that were *reasonably*

*calculated* to end the harassment of which it was aware?").

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

- 15

1          **C.  Race Discrimination/Disparate Treatment Claims**

2          To establish a prima facie case of race discrimination under Title VII, a plaintiff must

3  show that (1) he is a member of a protected class, (2) he performed his job satisfactorily, (3) he

4  suffered an adverse employment action, and (4) the defendant treated him differently from a

5  similarly-situated employee who does not belong to the same protected class. *See Cornwell v.*

6  *Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).[3] If the plaintiff establishes a

7  prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory

8  reason for its action. *See McDonnell Douglas*, 411 U.S. at 802–04; *Hines*, 112 P.3d at 529. If the

9  defendant does so, the plaintiff must then demonstrate that the reason asserted by the defendant is

10 mere pretext. *See id.*

11         Graybar does not deny that Copeland was a member of a protected class and that he

12 suffered an adverse employment action when his employment was terminated. It argues his

13 discrimination claims must fail, however, because he cannot show that Graybar treated him

14 differently from any genuine comparator employee. Copeland responds that Graybar treated him

15 differently from how it treated Fred Christian; Copeland was ultimately fired for causing

16 workplace disruptions, while Christian was not. When Christian's objective actions are stripped

17 of Copeland's subjective, conclusory characterizations, however, as recounted above, it is not at

18 all clear that Christian is a legitimate comparator.

19         In any event, the Court concludes that even if Copeland has made out a prima facie case of

20 discrimination that would require factfinding by a jury, Graybar has established as a matter of law

21

22 ---
[3] Similarly, under the WLAD, the plaintiff must show that: (1) he belongs to a protected class; (2) he was treated
less favorably in the terms or conditions of his employment (3) than a similarly situated, non-protected employee,
23 and (4) the plaintiff and the non-protected comparator were doing substantially the same work. See Washington v.
Boeing Co., 19 P.3d 1041, 1048 (Wash. Ct. App. 2000).

24 ORDER GRANTING DEFENDANT'S
   MOTION FOR SUMMARY JUDGMENT

25   - 16

1   that it had a legitimate, nondiscriminatory reason for terminating Copeland's employment. In his

2   own words, Copeland concedes that in response to a work request from Tyler Aves, a lead

3   material handler, Copeland "used foul language," "yell[ed] at" Aves, and "lost his temper."

4   Copeland Decl., ¶ 21. For this incident, as noted, he received a second hard warning, the final step

5   before termination, and Copeland has not challenged the legitimacy of this admonition. Copeland

6   also does not deny that several months later, he confronted his coworkers in a way that made

7   them feel "threatened" and "unsafe." Combined with other incidents in which Copeland caused

8   work disruptions in the wire department, Copeland's (at best) circumstantial evidence of disparate

9   treatment simply does not hold up. It is clear Graybar had documented and corroborated non-

10  discriminatory grounds for firing Copeland.

11        Nor has Copeland been able to produce evidence that these grounds were pretextual. Once

12  an employer has proffered evidence of nondiscriminatory grounds for termination, which

13  Copeland acknowledges Graybar has done here, a plaintiff may avoid summary judgment by

14  demonstrating pretext in two ways: either "(1) indirectly, by showing that the employer's

15  proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise

16  not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

17  employer." *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir.

18  2000). A plaintiff cannot prevail at the pretext stage, however, by producing only

19  "'uncorroborated and self-serving' testimony." *Opara v. Yellen,* 57 F.4th 709, 726 (9th Cir. 2023)

20  (citation omitted). Such testimony, which may suffice to support a plaintiff's case at the prima

21  facie stage, is insufficient once an employer has produced evidence of a legitimate

22  nondiscriminatory reason for termination. *Id*. (although alleged comments by supervisor evincing

24  ORDER GRANTING DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT

25  - 17

age discrimination might be "sufficient direct evidence to support a prima facie case of age discrimination, at the pretext stage, we have "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony."). Instead, "specific, substantial evidence of pretext" is required. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998).

Copeland has failed to meet this standard. He first argues that the "un-remediated hostile work environment" is evidence that Graybar's proffered reason for his termination is pretextual. As discussed more fully above, however, Copeland has failed to demonstrate both the existence of a hostile work environment, and that Graybar management failed to take proportionate remedial measures. *Supra*, §§ II.B.2&3.

Copeland next points to "stereotyped attitudes" of Graybar management as evidence of pretext. This argument fails as well. First, he claims that the second written warning, given based on Tyler Aves' having felt "threatened" by Copeland's outburst, plays into (in Copeland's words) "angry black man" racial stereotyping. But Copeland has admitted to using foul language, yelling at, and losing his temper at Aves—in other words, to threatening him. Copeland Decl. ¶ 21. Graybar's labeling of this behavior as "threatening" is descriptive, not stereotyping. Copeland also argues that Wilson's "professed fear" about Copeland owning guns is racially tinged.[4] But it is undisputed that Copeland, as a former felon, was not legally permitted to possess firearms. *See* Copeland Dep., 105:12-106:22. Combined with Copeland's allegedly untreated mental health issues, Wilson's concerns about Copeland possessing firearms are not unreasonable, and certainly

---

[4] Plaintiff does not provide citation to the record to support this claim that Wilson had a "fear" of Copeland. *See* Pl.'s Opp. at 26. Wilson did testify that he was "concerned" that Copeland allegedly owned firearms "that he wasn't supposed to have," particularly in the context of Copeland's allegedly professed mental health issues. Wilson Dep., 27:7-8.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

not evidence of racial animus.

Finally, in support of his pretext argument, Copeland argues "[a]s explained above, in numerous instances Graybar personnel misrepresented statements and facts related to Copeland and his complaints and those of others." Pl.'s Resp. at 26. This exceedingly vague, uncited attempt to demonstrate pretext fails in multiple respects, not least because it fails even to point the Court to exactly what "numerous instances" Copeland is referring to. This argument simply does not meet the high standard the Ninth Circuit has set for the "specific, substantial evidence" necessary for a plaintiff to show that an employer's proffered nondiscriminatory reason for termination is pretext. *Godwin,* 150 F.3d at 1221. Ultimately, none of the arguments Plaintiff has offered in support of his claim that Graybar's reasons for termination are pretextual is supported by anything other than his own uncorroborated testimony and vague and/or conclusory assertions, and Defendant's motion for summary judgment on Plaintiff's disparate treatment claims is therefore granted.

### D.  Retaliation Claims

Both Title VII and the WLAD prohibit an employer from retaliating against an employee who engages in protected activities. *See* 42 U.S.C. § 2000e-5; RCW § 49.60.210. To prevail on a retaliation claim under either statute, a plaintiff must show (1) that he was engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) and that there is a causal connection between the protected activity and the adverse employment action. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir. 2004); *Lodis v. Corbis Holdings, Inc.*, 292 P.3d 779, 786 (Wn. App. 2013). Making a complaint to a supervisor about racial discrimination or harassment may satisfy the first element. *See Vasquez,* 349 F.3d at 645. Termination of

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1    employment undisputedly satisfies the second element. As to the third element, to establish

2    causation under Title VII, a plaintiff must show that his protected activity was a "but-for" cause

3    of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521

4    (2013). Under the WLAD, a plaintiff only has to show that the protected activity was a

5    "substantial factor" in the employer's decision to take the adverse employment action. *Allison v.*

6    *Housing Auth. of City of Seattle,* 821 P.2d 34, 42–43 (1991).

7         Graybar disputes only that Copeland will be able to prove the third element, causation. As

8    noted above in the context of Plaintiff's disparate treatment claims, Graybar has established as a

9    matter of law that it had a legitimate, nondiscriminatory reason for terminating Copeland's

10   employment. The only substantiated "evidence" Copeland has that this reason is pretextual and

11   his termination was in fact retaliatory is what he claims is a "compelling inference" that arises

12   from the temporal proximity of his reporting his discrimination claims to Horst, and his

13   termination, just over one week later.

14        In that intervening week, however, it is undisputed that Copeland confronted several

15   coworkers in a way that made them feel "unsafe" and "threatened"—in a context, moreover, in

16   which Copeland had already been admonished for admittedly using obscene language in the

17   workplace. Plaintiff characterizes Graybar's justification for his firing as "shifting," but Graybar

18   managers have consistently and repeatedly testified that Copeland's confrontations of Nate Oei

19   and others, in addition to the multiple documented workplace disruptions in the months leading

20   up to that, were the reason for his termination:

21        Q. what was the reason that was discussed for terminating Rico? . . .

22        A. After the incident where we discussed the use of the N-word and he admitted
          to having used it and then came back and said he didn't use it, involving multiple

23

24   ORDER GRANTING DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT

25    - 20

other employees, causing disruption, accusing them of having said this or that
relating to that conversation . . . . And that that disruption was -- it was a big
disruption to the team and that that was continuing, and there seemed to be --
there didn't seem to be a way -- another way to resolve that.

Levack-Neil Dep., 99:14-100:6; *see also id.*, 15:3-6 ("Q. Ms. Levack-Neil, why was Rico

Copeland fired? A. That termination was made based on a continued disruption to our workplace

and the difficult work environment that that caused."); *see also* Hull Dep. 20:14-22:14 ("Q. And

tell me: Why was Rico fired? A. Rico was -- continued to disrupt the work -- the workforce.. . . I

recall that he had used the "N" word and his manager talked to him about it being not acceptable

in the workplace. . . . And he -- after that incident, he went around confronting employees, trying

to find out who told him or told management that he said that. . . . Q. Was him allegedly going

around to talk to other employees one of the bases for his termination? A. Yes."). This incident

occurred in the week between Copeland's grievance to Horst and Copeland's firing, eliminating

any inference to which Copeland may have been entitled of a causal connection between those

two events.

While Levack-Neil and Wilson have both referenced Copeland's complaints to them as

being disruptive to the workplace, as outlined more fully above these complaints were repeatedly

investigated and found lacking in substance. There is simply no evidence, let alone evidence that

is specific and substantial, that Graybar's justification for Copeland's firing was pretextual and

that Copeland was terminated for engaging in protected activity. Plaintiff's retaliation claims are

therefore dismissed.

///
///

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

- 21

1

## IV.   CONCLUSION

2         For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and

3   Plaintiff's Complaint is dismissed.

4         DATED this 10th day of July, 2023.

5

6         _____
          Barbara Jacobs Rothstein
7         U.S. District Court Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   ORDER GRANTING DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT
25    - 22